UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

DWAYNE BECKER and
EVA WU WEN BECKER,

Plaintiffs,

v.

RICK HARRY, ANITA SCHLANK,
JOANNE FAIRFIELD, DEBBIE JAMES,
RICHARD O'CONNOR and
DAVID DIPMAN,

Defendants.

Civil File No. 01-706 (JEL/JGL)

**REPORT AND RECOMMENDATION**

Dwayne Becker and Eva Wu Wen Becker, Moose Lake Regional Treatment Center, 1111 Highway 73, Moose Lake, Minnesota, 55767, Plaintiffs, pro se.[1]

Cynthia B. Jahnke, Assistant Minnesota Attorney General, Suite 900, 445 Minnesota Street, St. Paul, Minnesota, 55101-2127, for Defendants.

JONATHAN LEBEDOFF, United States Magistrate Judge

Plaintiff Dwayne Becker, a civilly committed detainee who is confined at the Minnesota Sexual Psychopathic Personality Treatment Center, ("MSPPTC"), and his wife, co-Plaintiff Eva Wu Wen Becker, are seeking relief for alleged violations of their legal rights under Minnesota law and the United States Constitution. The named Defendants, six employees of the State of Minnesota who are affiliated with the MSPPTC, have filed a motion seeking to have this action dismissed pursuant to Fed. R. Civ. P. 12(b). (Docket No. 26.)

[1] Presumably only Dwayne Becker actually resides at the Moose Lake Regional Treatment Center. No separate address has been furnished for his wife and co-plaintiff, Eva Wu Wen Becker.

FILED JUN 13 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

The matter has been referred to the undersigned for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons discussed below, it will be recommended that Defendants' motion be GRANTED, and that this action be DISMISSED.

## I. BACKGROUND

In 1995, Plaintiff Dwayne Becker, (hereafter "Becker"), was civilly committed under the laws of the State of Minnesota as a "Sexual Psychopathic Personality" and as a "Sexually Dangerous Person." See generally Minn.Stat. § 253B; see also In the matter of Becker, No. C3-96-766 (Minn.App. 1997) 1997 WL 470170, review denied, Oct. 21, 1997. As far as the Court can tell, Becker has been committed for an indefinite term. He is currently being detained at the MSPPTC, as a patient of the Minnesota Sex Offender Program, ("MSOP"). The MSPPTC is a secured detention facility maintained by the Minnesota Commissioner of Human Services. Co-plaintiff Eva Wu Wen Becker, (hereafter "Eva"), is Becker's wife. Plaintiffs are asserting two closely related claims, based on events that occurred at the MSPPTC during first several months of 2001.

Plaintiffs' first claim is based on certain alleged acts by Defendant Joanne Fairfield, the Assistant Clinical Director of the MSOP. The Amended Complaint[2] alleges that –

> "Joanne Fairfield had numerous contacts with Eva Becker that were nothing more then [sic] attempts to discourage her relationship with Dwayne Becker, and attempts to establish her own personal relationship with defendants [sic] wife. Tactics used were insulting Plaintiff Dwayne Becker to wife calling him a very dangerous individual, putting her hand on the plaintiff Eva then escorting her to Joanne's office by Eva's hand and putting her hand on Eva's shoulder. When Eva asked that Defendant Joanne no longer contact her and she [no?] longer wanted to meet with defendant. When Plaintiff showed up

[2] Plaintiffs had to file an amended pleading because their original complaint, (Docket No. 1), was not signed by either one of them. Therefore, the operative pleading at this time is Plaintiffs' Amended Complaint, (Docket 12).

> for visit Joanne came out and forced her to come to her office even after Eva requested Joanne to leave her alone and friend stepping in to intervene was told to mind her own business. It was at this time that plaintiff agreed to go with Defendant Joanne and not cause a scene. The whole time being fearful of the retaliation brought on to her husband if she did not cooperate and submitted to Defendant's demands to return to her office and further subjected to verbal harassment by the defendant insulting and degrading plaintiffs husband. It was after this encounter that plaintiffs wife and himself put request to desist any further contact between plaintiff's wife and Joanne."

(Amended Complaint, [Docket No. 12], p. 4B, ¶ 3.)

Based solely on these inartfully drafted allegations, Plaintiffs claim that Defendant Fairfield violated their "right to privacy" under the federal Constitution and the Minnesota "Patients Bill of Rights" law, (Minn.Stat. § 144.651). This "right to privacy" claim is also brought against two other named Defendants – Rick Harry, the Chief Operating Officer of the MSOP, and Anita Schlank, the Clinical Director of the MSOP.[3] Plaintiffs claim that Harry and Schlank should be held liable on the right to privacy claim, because they allegedly were made aware of the allegations against Defendant Fairfield but "made no investigation" and failed to "intervene in protecting the plaintiff[s'] rights." (Amended Complaint, p. 4B, ¶s 9 and 11.)

Plaintiffs' second claim stems from an incident that occurred on March 17, 2001. Eva visited Becker on that date, and during the course of that visit, Becker allegedly rubbed his wife's back and kissed her. A few days later, Becker was charged with violating the MSPPTC's visitation rules, which limit physical contact between patients and visitors. The

---

[3] It appears that Plaintiffs also intended to bring their right to privacy claim against another MSOP employee, Frank Milczark. However, Milczark is not named as a Defendant either in the caption of the Amended Complaint or in the list of Defendants set forth in the Amended Complaint. More significantly, it does not appear that service of process was ever effected on Milczark, so the Court lacks personal jurisdiction over him.

charges were reviewed by an "Operational Team" at an Operational Team Meeting. The Operational Team allegedly included Defendants Joanne Fairfield, Rich O'Connor, Debbie James and David Dipman. The Operational Team concluded that Becker had indeed violated the visitation rules, and that he should be disciplined. He was placed on "Level A" room restrictions for six days and "Level B" room restrictions for twelve days, and his visitation rights were restricted for thirty days.[4]

During the six days when the "Level A" restrictions were in effect, Becker was generally not allowed to leave his housing unit. He was not permitted to use the patient kitchen or food lockers, or have other patients cook for him; he was not permitted to engage in activities outside of his unit; he was not permitted to use the canteen and he was not permitted to receive any food or canteen items from others; he was not permitted to visit with other patients in his room or their rooms; he was placed on night lockdown; and he was required to attend certain "community meetings." Similar but somewhat less restrictive conditions were imposed during the twelve days when the "Level B" restrictions were in effect.[5]

---

[4] Becker has submitted documentation showing that a state ombudsman reviewed a videotape of the visiting room incident and concluded that Plaintiffs had not violated the visitation rules. (See Letter dated May 4, 2001, attached to "Plaintiff(s) Memorandum For The Denial Of Defendant(s) Motion To Dismiss This Suit For Relief," [Docket No. 31].) This letter arguably creates a factual issue as to whether Plaintiffs actually did violate the visitation rules. However, the Court finds any such issue to be immaterial, for reasons discussed hereafter. (See footnote 11, infra.)

[5] The Level A and Level B restrictions are listed at pp. 4-6 of the MSOP/MSPPTC "Procedure for Behavioral Expectations," which is attached to the Affidavit of Joanne Fairfield, (Docket No. 28), as Exhibit 7.

Becker filed a grievance challenging the disciplinary sanctions imposed by the Operational Team, but the sanctions were upheld. He now claims that the disciplinary sanctions imposed by Defendants Fairfield, O'Connor, James and Dipman violated his constitutional right to due process.

Plaintiffs are seeking a declaratory judgment upholding their statutory and constitutional rights to privacy and due process. They are also seeking compensatory damages in the amount of $100,000, (even though the Amended Complaint does not describe any specific injury suffered by either of the Plaintiffs), as well as punitive damages in the amount of $100,000.

## II. STANDARD OF REVIEW

A motion to dismiss may be made for "failure to state a claim upon which relief can be granted" and requires a court to review only the pleadings to determine whether the plaintiff has a viable claim. See Fed. R. Civ. P. 12(b)(6). When "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Id.; see also Buck v. F.D.I.C., 75 F.3d 1285, 1288 & n.3 (8th Cir. 1996). In this case, the parties on both sides have offered, and the Court has considered, evidentiary submissions that are outside of the pleadings. The motion to dismiss will therefore be disposed of pursuant to Rule 56.[6]

Under Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

[6] Plaintiffs obviously recognized that Defendants' motion might be treated as a summary judgment motion. Defendants alluded to that possibility in their brief in support of their motion, and Plaintiffs' opposition -- entitled "Motion To Deny Defendants' Motion To Dismiss Or For Summary Judgment" – is supported by evidentiary submissions.

that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A disputed fact is "material" if it must ultimately be resolved and if its resolution will determine the outcome of the case. Id. Materiality is determined by examining the substantive law of the claims. Id.

The non-moving party may not rest upon the pleadings alone as a response but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Although the evidence is examined in the light most favorable to the non-moving party, (see Anderson, 477 U.S. at 255), the non-moving party may not rely on mere allegations or denials. See Lambert v. City of Dumas, 187 F.3d 931, 934 (8th Cir. 1999) (citations omitted). Additionally, the movant is entitled to summary judgment when the non-movant fails to establish the existence of an essential element of a claim on which that party has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). No genuine issue of material fact exists absent such foundation because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

## III. DISCUSSION

### A. Constitutional Right To Privacy Claim

Plaintiffs initially contend that Defendant Joanne Fairfield (as well as Defendants Harry and Schlank) should be held liable under 42 U.S.C. § 1983 for violating Plaintiffs' constitutional right to privacy. This claim is based on vague allegations that Fairfield

interfered with the privacy of Plaintiffs' marital relationship by trying to alienate Eva from Becker.

The Supreme Court has frequently confirmed that the marital relationship lies "within the zone of privacy created by several fundamental constitutional guarantees." Griswold v. Connecticut, 381 U.S. 479, 485 (1965). In Hodgson v. Minnesota, 497 U.S. 417, 446 (1990), the Court explained that "[w]hile the State has a legitimate interest in the creation and dissolution of the marriage contract... [citations omitted], the family has a privacy interest in the upbringing and education of children and the intimacies of the marital relationship which is protected by the Constitution against undue state interference." (Emphasis added.)

The constitutional protections afforded to the marital relationship do not cease to exist behind the walls of a prison or other detention facility. Turner v. Safley, 482 U.S. 78, 95-96 (1987) (upholding prisoners' constitutional right to marry). Individuals who are incarcerated, however, do not have the same constitutional privacy rights as others. Id. ("[t]he right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration"). "Rights of marital privacy, like the right to marry and procreate, are necessarily and substantially abridged in a prison setting." Hernandez v. Coughlin, 18 F.3d 133, 137 (2nd Cir.) (holding that the Constitution "does not create any protected guarantee to conjugal visitation privileges while incarcerated"), cert. denied, 513 U.S. 836 (1994). Indeed, "[i]ncarceration is simply inconsistent with the vast majority of concomitants to marriage, privacy and personal intimacy." Gerber v. Hickman, No. 00-16494 (9th Cir. May 23, 2002) 2002 WL 1033636 at *2 (upholding prison's refusal to allow inmate to artificially

inseminate his wife).[7]

In this case, Plaintiffs contend that state employee Joanne Fairfield violated their constitutionally protected right to marital privacy by certain specific actions described in the Amended Complaint. It is alleged that Fairfield (i) attempted to "establish her own personal relationship" with Eva, (ii) "insulted" Becker and called him a "very dangerous individual," (iii) put her hand on Eva and escorted Eva to her (Fairfield's) office, (iv) "forced" Eva to come to her (Fairfield's) office after Eva asked to be left alone, and (v) subjected Eva to "verbal harassment" that included "insulting and degrading" comments about Becker. (Amended Complaint, p. 4B, ¶ 3, quoted at pp. 2-3, supra.)

For present purposes, the Court must assume that the Amended Complaint accurately describes Fairfield's actions. The Court finds, however, that Fairfield's conduct, as described in Plaintiffs' pleading and the evidentiary submissions of record, is not sufficiently egregious to support a § 1983 right to privacy cause of action. The Supreme Court has clearly indicated that the right to marital privacy protects citizens from undue governmental interference. Hodgson, 497 U.S. at 446. Fairfield's alleged behavior may be subject to criticism, but it does not rise to the level of constitutionally prohibited interference with Plaintiffs' marital relationship.

Although the boundary lines of the constitutional right to marital privacy may not be well-defined, no court could conclude that Defendant Fairfield's conduct, as described in the present record, crossed over those lines. No reasonable judge or juror could find that

[7] The constitutional right to privacy does not guarantee contact visitation rights even to unconvicted detainees, (Block v. Rutherford, 468 U.S. 576 (1984)), so Plaintiffs cannot assert a privacy claim based on the MSPPTC visitation policy that restricted their physical contacts during Eva's visits with Becker.

Fairfield violated Plaintiffs' constitutional rights by taking Eva's hand or touching her shoulder and escorting her to an office. Nor could any reasonable judge or juror find that Fairfield violated Plaintiffs' constitutional rights by trying to establish "a personal relationship" with Eva.[8] If Fairfield did indeed make "insulting and degrading" remarks about Becker to Eva, it could be argued that Fairfield acted unprofessionally and inappropriately, but such remarks could not be viewed as a violation of Plaintiffs' federal constitutional rights.

In sum, if Fairfield interfered with Plaintiffs' marital privacy at all, it was not the type of "undue state interference" that is prohibited by the federal Constitution. Thus, the Court concludes, as a matter of law, that Plaintiffs have failed to state an actionable § 1983 right-to-privacy claim against Defendant Fairfield -- or against her superiors, Defendants Harry and Schlank.[9]

---

[8] Plaintiffs suggest in their opposition memorandum, (which is not signed by Eva, but only by Becker), that Fairfield was attempting to initiate a sexual relationship with Eva. ("Plaintiff(s) Memorandum [etc.]," [Docket No. 31], p. 2.) However, there are no facts alleged in the Amended Complaint, or appearing elsewhere in the record, to support that farfetched notion.

[9] Although Defendants have not chosen to rely on the doctrine of qualified immunity, they undoubtedly could have done so. State officials are "immune from suit on the basis of qualified good faith immunity unless (1) their conduct violated a constitutional right of the plaintiff... that was clearly established prior to the time of the alleged acts of the ... officials; (2) they knew or should have known of the clearly established right at the time of the violation; and (3) they knew or should have known that their conduct violated that right." Brown v. Frey, 889 F.2d 159, 165 (8th Cir. 1989), cert. denied, 493 U.S. 1088 (1990). To overcome a qualified immunity defense, the plaintiff must be able to show that the constitutional right that he or she is asserting was sufficiently well-established "that a reasonable official would understand that what he [or she] is doing violates that constitutional right." Id. In this case, it cannot be said that Defendant Fairfield's alleged behavior toward Eva violated the "clearly established" parameters of the constitutional right to marital privacy. Therefore, Fairfield (as well as her superiors) would certainly be entitled to qualified immunity with respect to the constitutional right to privacy claim asserted by

B. Due Process Claim

Plaintiffs' second § 1983 claim stems from the disciplinary sanctions imposed on Becker for his alleged violation of the MSPPTC visitation rules. Becker claims that he was deprived of his constitutional right to due process in connection with that matter. Defendants contend that the disciplinary sanctions imposed on Becker were not severe enough to support a § 1983 due process claim. The Court agrees with Defendants.

Because Becker is incarcerated but not currently serving a prison sentence for a criminal conviction, his status is much like that of a pre-trial detainee who is incarcerated but has not yet been convicted of any crime. It is therefore reasonable to assume that a civilly committed detainee's due process rights must be comparable to those of a pre-trial detainee. See Youngberg v. Romeo, 457 U.S. 307, 320 (1982) (recognizing similarity between due process rights of civilly committed detainees and those of pre-trial detainees). See also Moore v. Conorey, No. CIV. 94-630-GBC (S.D.Ill. 1995) 1995 WL 549133 at *2 (drawing analogy between pre-trial detainees and the civilly committed).[10]

In Bell v. Wolfish, 441 U.S. 520 (1979), the Supreme Court held that pre-trial detainees cannot be "punished" without being afforded the procedural protections of due process. Id. at 535 ("under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law"). The Court added,

---

Plaintiffs in this action.

[10] It is hard to imagine why a civilly committed detainee would be entitled to any greater due process protection than a pre-trial detainee, because a civilly committed detainee has already received the benefit of a complete court trial before being confined, whereas a pre-trial detainee has normally received no more than a preliminary "probable cause" hearing.

however, that not every sanction imposed against a pre-trial detainee can be considered a form of punishment that implicates due process concerns. In the words of the Court, "'[t]here is, of course, a de minimis level of imposition with which the Constitution is not concerned.'" Id. at 539, n. 21, quoting Ingraham v. Wright, 430 U.S. 651, 674 (1977).

Here, the Court finds that the sanctions imposed against Becker do not surpass the "de minimis" threshold. Becker's customary privileges were somewhat limited for eighteen days, and his visitation privileges were restricted for thirty days, but there is nothing in the record to suggest that these sanctions caused any real hardship to Becker. Although Becker undoubtedly was upset about the sanctions at issue, they simply were not severe enough, and they did not last long enough, to have any constitutional significance.[11]

The inadequacy of Becker's due process claim can be readily understood by comparing this case with Smith v. Copeland, 87 F.3d 265 (8th Cir. 1996). Smith was a § 1983 action brought by a pre-trial detainee who was seeking relief for alleged violations of his right to due process. Smith alleged that he was placed in "segregated confinement" for four days. He further alleged that the toilet in his isolation cell overflowed, and "that he was 'made to endure the stench of [his] own feces and urine'" during the four days that he was in segregated confinement. Id. at 268.

The "deprivations" that Becker endured as a result of his Level A and Level B restrictions and his visitation restrictions are not nearly as onerous as those described in

---

[11] If Becker did not actually violate the MSPPTC visitation rules, as suggested by an ombudsman's report, (see n. 4, supra), then Becker certainly had good cause to be upset about the sanctions imposed by Defendants. The fact remains, however, that the sanctions were simply not severe enough to have constitutional significance. Thus, for purposes of determining whether Plaintiffs have an actionable § 1983 claim, it is immaterial whether Becker actually did or did not violate the rules.

Smith. Becker was not kept in an isolation cell; he merely lost some of his normal privileges, such as canteen visits and outdoor recreational time. Smith, on the other hand, allegedly endured several days of complete isolation, during which he lived in "raw sewage." Yet the Eighth Circuit still found Smith's due process claim to be inadequate, as a matter of law. The Court held that even Smith's "'raw sewage' allegation" amounted to no more than "a de minimis imposition" that did not "implicate constitutional concerns." Id.

If the conditions described in Smith's complaint lacked constitutional significance, the same must be true here. Thus, the Court concludes that the deprivations described in Plaintiffs' Amended Complaint amount to no more than a "de minimis imposition." Because Becker has failed to allege that any constitutionally significant punishment was imposed by Defendants, he has failed to state an actionable due process claim.[12]

Defendants have further argued that even if the disciplinary sanctions imposed on Becker were considered to be a "punishment" requiring due process, Becker still would not have an actionable due process claim, because he has not identified any specific deficiency in the grievance procedure that was available for challenging those sanctions. Becker apparently was informed of the charge against him, and he had an opportunity to present his objections to that charge at an Operational Team Meeting and by submitting a written grievance that was reviewed by Defendants. Although Becker obviously is dissatisfied with the outcome of the review process, he has not explained why he believes the process itself

[12] The Court's analysis of Becker's due process claims obviously follows Magistrate Judge Susan Richard Nelson's analysis in DeVillion v. Milczark, Civil No. 01-617 (DWF/SRN), which was cited by Defendants. The due process claims raised in the DeVillion case were very similar to those presented here, and the Court finds Judge Nelson's analysis to be cogent, persuasive and directly applicable here.

(as opposed to its final outcome) was flawed. In short, even if Becker were entitled to due process, there is nothing in the Amended Complaint (or the rest of the record) that suggests he did not receive due process. See Boutchee v. Grossheim, 11 F.3d 101, 103 (8th Cir. 1993) (noting that "minor sanctions for disciplinary reports can be imposed after significantly less formal procedures" and concluding that the inmate-plaintiff's appeals to a hearing officer and the warden afforded all the process due under the circumstances).

C. State Law Claims

Plaintiffs' claims in this matter are not based entirely on the federal Constitution; Plaintiffs also rely on state law, including the Minnesota Patients Bill of Rights. If Plaintiffs are relying on state law to support their § 1983 claims, their reliance is misplaced, because claims based solely on state law are not actionable under § 1983. Holloway v. Reeves, 277 F.3d 1035, 1038 (8th Cir. 2002). However, it also is possible that Plaintiffs are attempting to bring an independent state law claim into federal court via the supplemental jurisdiction statute -- 28 U.S.C. § 1367. To the extent that Plaintiffs are attempting to bring any state law claims under the supplemental jurisdiction statute, it will be recommended that their claims be dismissed without prejudice.

28 U.S.C. § 1367(c)(3) permits federal district courts to refrain from exercising supplemental jurisdiction over state law claims when the court has "dismissed all claims over which it has original jurisdiction," as is the case here. Indeed, "when federal claims are dismissed before trial, the normal practice is to dismiss pendent [state law] claims." Stokes v. Lokken, 644 F.2d 779, 785 (8th Cir. 1981); see also, Save Our Health Organization v. Recomp of Minnesota, 829 F.Supp. 288, 293 (D.Minn. 1993), aff'd, 37 F.3d 1334 (8th Cir. 1994). The instant case has not progressed beyond the pleading stage, so

the interests of "judicial efficiency, convenience, and fairness to the litigants" will not be compromised by the federal court's refusal to entertain Plaintiffs' state law claims. Condor Corp. v. City of St. Paul, 912 F.2d 215, 221 (8th Cir. 1990). Furthermore, a federal district court would not be the most suitable forum for adjudicating Plaintiffs' state law claims. See id. at 220 (stressing "the need to exercise judicial restraint and avoid state law issues wherever possible"). Thus, the Court concludes that it would not be appropriate to exercise supplemental jurisdiction over any state law claims that Plaintiffs may be trying to bring. Those claims should be dismissed without prejudice, leaving Plaintiffs free to pursue them in the state courts, if they choose. See, Stokes v. Lokken, 644 F.2d at 785.[13]

## IV. CONCLUSION

For the reasons discussed above, the Court concludes that Plaintiffs cannot maintain a cause of action under 42 U.S.C. § 1983 based on the facts shown in their Amended Complaint and the evidentiary record. It is therefore recommended that Defendants' motion to dismiss be granted, and that this action be dismissed. It follows, of course, that Plaintiffs' "Motion To Deny Defendants' Motion To Dismiss Or For Summary Judgment," (Docket No. 30), must be denied.

---

[13] Defendants contend that Plaintiffs' state law claims are barred by the Eleventh Amendment. Although it appears that the Eleventh Amendment would indeed bar Plaintiffs from bringing their current state law claims in federal court, it is less clear how the Eleventh Amendment would apply if the same claims were raised in state court. Given the Court's determination that supplemental jurisdiction should not be exercised here, it is unnecessary to decide whether the Eleventh Amendment would preclude Plaintiffs from bringing their state law claims in state court. Even though the recommended disposition of this action will not, by itself, bar Plaintiffs from proceeding in state court, it should be noted that the Court finds no reason to think Plaintiffs might actually have a viable state law claim.

Finally, the Court notes that Plaintiffs have filed a motion, (Docket No. 24), which seeks to overturn the District Court's prior order denying Plaintiffs' request for a default judgment against Defendants. (See Order dated October 31, 2001; [Docket No. 22].) Plaintiffs contend that the prior order should be vacated, because they never had any opportunity to object to this Court's earlier Report and Recommendation that recommended their request for default judgment should be denied. (Docket No. 21.) However, Plaintiffs still have not offered any objection to the earlier Report and Recommendation, and it is now even more evident that they are not entitled to a default judgment in this case. It is therefore recommended that Plaintiffs' currently pending motion pertaining to their request for default judgment be denied.

**V. RECOMMENDATION**

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendants' motion to dismiss, (Docket No. 26), be GRANTED;

2. Plaintiffs' claims based on alleged violations of their federal constitutional rights be dismissed with prejudice, and Plaintiffs' claims based solely on state law be dismissed without prejudice;

3. Plaintiffs' "Motion To Deny Defendants' Motion To Dismiss Or For Summary Judgment," (Docket No. 30), be DENIED;

4. Plaintiffs' motion (Docket No. 26) seeking to set aside the Order dated October 31, 2001, be DENIED; and

5. This action be DISMISSED.

Dated: June 12, 2002

JONATHAN LEBEDOFF
Chief Magistrate Judge

Under D.Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by June 28, 2002, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.